R. E. Martin v. Commissioner.
Martin v. Commissioner
Docket No. 111989.
United States Tax Court
1944 Tax Ct. Memo LEXIS 394; 3 T.C.M. (CCH) 32; T.C.M. (RIA) 44013; January 19, 1944
*394 Milton B. Ignatius, Esq., and Frank Hempstead, C.P.A., for the petitioner. J. Marvin Kelley, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding involves deficiencies in income tax for 1937, 1939, and 1940 in the respective amounts of $783.93, $24,508.46, and $286.49. The questions for our determination are (1) whether petitioner is taxable in 1937 and 1939 on income which he claims to have received as guardian for his two sons; (2) whether petitioner is taxable, in 1937, 1939, and 1940, on the income from properties which previously he had transferred to his two sons ostensibly in satisfaction of his guardianship liability to them; and (3) whether petitioner is entitled to a deduction in 1939 of the excess of the payments which he made to his sons in that year, in discharge of his guardianship liability, over the earnings from the alleged guardianship assets which he held. Other issues raised in the pleadings have been settled by stipulation. Petitioner claims that he has made overpayments of taxes for 1937, 1939 and 1940, in respect of which he is entitled to refunds, and the respondent claims increased deficiencies for all *395 of those years. Findings of Fact Petitioner is a resident of Georgia with his principal office at 1308 Broad Street, Columbus, Georgia. He filed his income tax returns for the years 1937 to 1940, inclusive, with the collector of internal revenue at Atlanta. All of such returns were made on the cash receipts and disbursements basis. Petitioner was born on a farm near Columbus in 1885. He had but little education, his formal schooling not extending beyond fractions. Circumstances made it necessary for him to begin work at an early age to help support his family. For a while he sold commercial insurance at Montgomery, Alabama, and later conducted a furniture business at Chattanooga, Tennessee. In 1912 he returned to Columbus and purchased a nickel moving picture theatre, known as the Bonita Theatre, located in that city. In 1914 he built another motion picture theatre, the Grand Theatre, in Columbus which he sold in 1917. In the meantime he had sold the Bonita and had repurchased it in 1915. Petitioner was married in 1916. His eldest son, R. E. Martin, Jr., was born March 25, 1917. A second son, E. D. Martin, was born January 30, 1920. In 1920 petitioner built the Pastime Theatre *396 in North Highlands, a suburb of Columbus, at a cost of between $10,000 and $11,000. It was put into operation in the fall of 1921. A part of the cost of construction and the furnishings were paid for by petitioner with funds obtained from the sale, in 1921, of several parcels of real estate belonging to his wife. She had inherited the property from her mother. The amount realized from the sale of the property was approximately $7,500. Petitioner deposited this money in his bank account and used all of it either in paying off obligations incurred in building the Pastime or for the furnishings and equipment for it. He did not give his wife any note or other evidence of indebtedness in respect of those funds and did not pay her any interest thereon. Both he and his wife considered that they had a common interest in each other's property. In 1922 or 1923 petitioner built the Palace Theatre in Phoenix City, Alabama, and in 1927 he began the construction of the Royal Theatre in Columbus. Petitioner's wife died intestate on June 14, 1928. It is stipulated that she left an estate of a value of $19,859 which under the laws of the State of Georgia passed in equal shares to petitioner and *397 her two sons. The value of the sons' interest was $13,239.34. Petitioner made no effort after his wife's death to determine and segregate her estate or the interest of his sons therein from his own estate and there was never any administration of her estate. Petitioner's wife's father, J. E. Miller, died testate on November 18, 1928, and one-third of his estate, which had been designated for the benefit of petitioner's wife, became distributable to petitioner's sons. Petitioner was appointed guardian for his sons by the Court of Ordinary, Muscogee County, Georgia, on December 28, 1928, and as such guardian received distributions from the J. E. Miller estate totaling $6,100. Entries in his journal show $5,000 received November 19, 1929, and $1,100 received December 4, 1929. Petitioner paid all of these funds on a note or notes which he had given the bank to obtain funds for the construction of the Royal Theatre. Petitioner's total capital investment in the Royal was $131,640.85. After his appointment as guardian petitioner never made any segregation of his wards' funds or kept any separate accounts for them and never filed any guardianship reports with the Court of Ordinary. Petitioner *398 steadily expanded his motion picture business until during the taxable years involved he operated about 70 theatres located throughout Georgia, Florida, and Alabama. Some of these he owned outright and some he operated through partnerships or corporations. Some time during 1937 petitioner was told by the president of the Columbus Bank & Trust Company from which he was borrowing money that he should make plans for an accounting of his guardianship of his sons as soon as the elder became of age in 1938. He consulted his attorney about the matter and was advised that he would have to account to his sons for the full amount of the profits which he had derived from the investment of the guardianship funds and that he should begin to set aside funds for that purpose. Shortly thereafter the petitioner began to invest guardianship funds which he theretofore had held as his own property in real estate in the name of his sons. In 1937 he purchased a theatre at Florala, Alabama, and also real estate at Roanoke, Alabama, and Port St. Joe. In 1938 and in 1939 he made purchases of numerous parcels of real estate the title to which was placed in his sons' names jointly and upon some of the lots *399 purchased moving picture theatres were built. The sons understood that they were owners of these properties from the times when they were purchased by their father for them. All of the properties purchased were in the joint names of the two sons and in separate income tax returns filed by the sons for the years 1937 to 1940 each son reported one-half of the net income from the properties. The petitioner kept no separate books of account for the sons in respect of real estate carried in their names. All income, even where collected by the sons, was turned over to the petitioner and deposited in his own bank account. The income and expenses of the sons' property can be segregated, in petitioner's books, from those of other properties belonging to the petitioner, and such segregation was made in the filing of returns by the petitioner and his sons for the taxable years here in question. A partnership was formed by the petitioner and his sons in which they were all equal partners as of January 31, 1940. Petitioner's books showed that the sons were indebted to him at that time in the amount of $163,038.17. A promissory note for that amount payable to petitioner was executed by the sons *400 and delivered to petitioner. Petitioner accepted the note upon advice of his bookkeeper that it was necessary in order to balance the books. In 1941 petitioner engaged a public accountant, Frank Hempstead, whom he had previously employed in connection with income tax matters, to go over his books and set up accounts showing his guardianship liability to his sons. Hempstead completed his report shortly before May 9, 1942, the date on which it was submitted to petitioner. It showed a total liability of petitioner to his sons of $316,189.53. In making his computation Hempstead began with the amount of $7,500 which petitioner received from the sale of his wife's real estate in 1921. That was all treated as invested in the Pastime Theatre, petitioner's interest being $2,500 and his sons' interest $5,000. Using $10,764.70 as the total cost of Pastime (it is now stipulated that that figure was erroneous and that the cost was in fact $11,764.70 at June 30, 1928), the sons' interest was found to be 46.5%. The $6,100 which petitioner received in 1929 from the J. E. Miller estate was all treated as invested in the Royal and as all belonging to the sons. The amount of $8,239.34, representing *401 the excess of the sons' share of their mother's estate at date of her death over $5,000, was treated as invested in petitioner's general business. Therefore, according to the report the total original guardianship funds consisted of $19,339.34, $5,000 of which was invested in the Pastime Theatre, $8,239.34 was invested in petitioner's general business, and $6,100 was invested in the Royal Theatre. The sons were treated as being entitled under the laws of the State of Georgia (section 108-415 of the Georgia Code of 1933) either to all of the profits from the identifiable investments of guardianship funds, or to interest on such funds computed at seven percent for the first six years without compunding and thereafter at six percent compounded annually provided the earnings on the investments were less than the interest computed at such rates. On that basis it was determined that the sons' share of the net profits of Pastime for the period July 1, 1928, to December 31, 1936, was $72,617.33, being 46.5 percent of the total earnings of $156,166.33. The earnings from the remaining $8,239.34, based on a percentage of the profits from petitioner's general business, or when there were no *402 profits then the interest on such funds, for the years 1929 to 1936, inclusive, were computed at $9,104.44. The percentage basis used in this calculation was the percentage which the amount of $8,239.34 bore to the estimated average annual capital invested in the business. The earnings attributed to the sons' interest in the Royal Theatre for the years 1929 to 1936, inclusive, were computed at $4,263.90. In the first four of those years the actual earnings attributed to the sons fell below seven percent of their investment and the larger figure (7% of $6,100, or $427) was taken as the amount due the sons. The annual earnings from all three of the above sources, that is, from the Pastime Theatre, from the Royal Theatre, and from the general business, amounting in the aggregate to $85,985.67, were treated as reinvestments in petitioner's general business and the earnings on such reinvestments for the years 1929 to 1936, inclusive, were separately computed at $83,502.22. That amount together with the $85,985.67 of earnings from Pastime, Royal, and the general business and the $19,339.34 of original funds made a grand total due the sons at December 31, 1936, of $188,827.23. Beginning *403 January 1, 1937, and continuing through July 31, 1939, there was credited to the amount due the sons the estimated earnings attributable to the investment of their funds in petitioner's general business based on the proportion of total earnings to the total capital invested in the business and debited all of the funds paid to or properties transferred to the sons during that period. For 1937 there were credits (estimated earnings) of $68,947.49 and debits (payments to the sons) of $30,429.35, leaving a balance due the sons of $227,345.37; for 1938 there were credits of $45,222.73 and debits of $168,230.46, leaving a balance due of $104,337.64; and for 1939 to July 31 there were credits of $13,192.08 and debits of $117,529.72, leaving the account closed. The amounts debited to the sons' account in 1939 represented only so much of the payments made to them by petitioner in that year as was needed to balance the account. On July 9, 1942, petitioner filed a petition with the Court of Ordinary, Muscogee Couty, for discharge of his guardianship to his sons. He submitted therewith an accounting of guardianship funds which was based on the Hempstead report. The following summary of the account *404 was stated in the petition: DR. To cash from: Date
Description
Amount
June 14, 1928
Estate of Mrs. Hattie Lou Martin
$ 13,239.34
Nov. 18, 1928
Estate of J. E. Miller
6,100.00
Jan. 1, 1929
Earnings on Investments
5,226.20
Jan. 1, 1930
Earnings on Investments
12,518.70
Jan. 1, 1931
Earnings on Investments
6,954.92
Jan. 1, 1932
Earnings on Investments
14,835.57
Jan. 1, 1933
Earnings on Investments
12,000.12
Jan. 1, 1934
Earnings on Investments
15,909.29
Jan. 1, 1935
Earnings on Investments
24,131.82
Jan. 1, 1936
Earnings on Investments
31,515.99
Jan. 1, 1937
Earnings on Investments
46,395.28
Total due January 1, 1937
$188,827.23
Year 1937
Earnings
$ 68,947.49
Year 1938
Earnings
45,222.73
Year 1939
Earnings
13,192.08
Total cash received
$316,189.53
CR. By cash payments made for the account and the benefit of the wards: R. E. Martin, Jr. and E. D. Martin
Payments Year 1937
Exhibit "A"
$ 30,429.35
Payments Years 1938
Exhibit "B" (and supporting schedules 1 to 3, inclusive)
168,230.46
Payments Year 1939
Exhibit "C" (and supporting schedules 4 to 10, inclusive)
117,529.72
Total payments
$316,189.53
The account as submitted *405 was approved by petitioner's sons and their counsel who represented them before the Court of Ordinary. The hearing on the petition was duly posted and the accounting submitted therewith was not opposed. The Court of Ordinary issued an order under date of August 21, 1942, approving the accounting as submitted and discharging petitioner as guardian. The court found that petitioner was indebted to his sons in the total amount of $316,189.53, the exact amount determined in the Hempstead report, and further found, as was represented in the petition, that the note for $163,038.17 which the sons had given to petitioner in 1940 was executed by mistake and was without consideration and should be surrendered to the sons for cancellation. Both of petitioner's sons were attending the University of Georgia during the years 1937, 1938, and 1939. Their school expenses were paid by petitioner and were reflected in the guardianship account which was submitted to the Court of Ordinary. Petitioner reported net losses in his income tax returns for the years 1929 to 1933, inclusive. He reported net income for the years 1934 to 1940, inclusive, as follows: 1934
$ 33,165.59
1935
95,954.18
1936
188,725.20
1937
262,570.08
1938
208,166.60
1939
290,243.45
1940
16,515.08
*406 Petitioner's books were examined by a revenue agent on several different occasions during the years 1936 to 1939, inclusive. The books did not contain any guardianship account or any records of guardianship funds. From 1925 to 1939 they carried an item of $7,500 as an indebtedness to petitioner's wife, or, after her death, of her estate. Interest was charged on that amount annually and was deducted in some or all of petitioner's income tax returns for those years. Up to the year 1940 petitioner reported the earnings from his various business enterprises in his individual income tax returns. Petitioner's wife filed separate returns for several years but did not report any of the income from the Pastime Theatre or any of petitioner's other enterprises. Petitioner's sons filed individual income tax returns for the years 1937 to 1940, inclusive. In their original returns for 1937 they each reported partnership income of $3,294.24 from "R. E. Martin, Jr. & E. D. Martin." They reported no other income and claimed no deductions. The income so reported represented the earnings attributable to the properties which petitioner had transferred to them in that year. They made similar returns *407 for 1938 and 1939, each reporting partnership income of $6,443.18 in 1938 and $21,109.55 in 1939. R. E. Martin, Jr. reported additional income in 1939 of $1,150 as "Salaries and other compensation for personal services." In their 1940 returns each of the sons reported $200 as salary and other compensation for personal services and a partnership loss of $629.27. Amended returns were later filed by them for 1937 showing a gross income for each of $11,473.18 from salaries and compensation for personal services and no other items of income or deductions. It is now agreed that no partnership existed between R. E. Martin, Jr. and E. D. Martin during any of the years prior to 1940. On March 12, 1941, petitioner filed with the collector of internal revenue at Atlanta, Georgia, a claim for refund on Form 843 for the year 1937 stating as follows: "An Internal Revenue Agent has just now completed an examination of prior years returns, which resulted in numerous changes. These changes will affect the income for the year 1937, and in addition it appears that the deduction for 'Interest Paid' is considerably understated. "An audit of the books and records for the year 1937 is now in process *408 and upon completion of same a detail statement of the taxable income will be submitted." The claim contained no other information or data except that it showed the amount of tax reported and paid by petitioner for 1937, viz., $136,247.65. The time for filing any refund claim for 1937 would have expired on March 15, 1941, three days after petitioner's claim was filed. On September 23, 1941, petitioner filed an amended claim for 1937 in which it was stated "The original claim for refund was filed on March 11, 1941. This claim, together with the attached data, is merely filed in support of the original claim filed." The amount of refund claimed in the amended claim was $100,000. It was represented therein that the original return was in error as to a number of different items of both income and deductions. None of those items, however, reated to any matter of guardianship funds. On March 10, 194,. petitioner filed a second amended claim in which for the first time he claimed the right to deduct as a business expense the amount of $30,429.35 which he transferred to his sons in 1937. The deficiency notice from which this proceeding was brought was mailed on May 8, 1942, and the petition *409 was filed on July 29, 1942. In determining the deficiencies herein the respondent in each year added to petitioner's income the earnings of the alleged partnership of "Martin & Martin," referred to above, which the sons had reported in their individual returns. These earnings as determined in the deficiency notice amounted to $2,532.78 in 1937, $45,418.56 in 1939, and $3,975.75 in 1940. The respondent in each year made a number of other adjustments in petitioner's returns which are not in dispute in this proceeding. Opinion Petitioner's contentions are (1) that he is not taxable in 1937 and 1939 on the earnings attributed in the Hempstead report to the investments of guardianship funds (such earnings as shown in the report amounted to $68,947.49 in 1937 and $13,192.08 in 1939); (2) that he is not taxable in 1937, 1939, and 1940 on the earnings of the properties which he had transferred to his sons in payment of his guardianship liability (these earnings amounted to $2,532.78 in 1937, $45,418.56 in 1939, and $3,975.75 in 1940); and (3) that he is entitled to a deduction in 1939 of the excess of the payments which he made to his sons in that year on his guardianship liability to *410 them (the total payments amounting to $117,529.72) over the earnings attributable to those payments (the earnings amounting to $13,192.08). It is contended by the petitioner that none of the earnings properly attributable to the guardianship funds are includible in his individual income tax returns; that the amount of such earnings was correctly computed in the so-called Hempstead report; and that in any event the order of the Court of Ordinary of Muscogee County fixing petitioner's guardianship liability to his sons is determinative of the ownership of the income in dispute and is binding upon this Court. Guardians are charged by law with the duty of filing income tax returns for their wards. Sections 51(c) and 142 of the Internal Revenue Code. The income belonging to a ward is taxable to him and not to his guardian. Freuler v. Helvering, 291 U.S. 35; Van Wart v. Commissioner, 295 U.S. 112. If our question here were simply that of determining the amount of the sons' interest in petitioner's estate by reason of the guardianship we would feel bound to accept the findings and order of the Court of Ordinary as determinative *411 of that fact. For it is a well settled rule of law that questions of property and property rights within each state are governed by the laws of that state and the decisions of its courts. See Tyler v. United States, 281 U.S. 497; Freuler v. Helvering, supra;Blair v. Commissioner, 300 U.S. 5; Morgan v. Commissioner, 309 U.S. 78. However, we do not think that the rule of those cases goes so far as to require us to accept the order of a Court of Ordinary in a guardianship proceeding as determinative of the liability of the principals for Federal income taxes. We think, too, that the facts in this case require an exception to the general rule regarding the recognition of the decisions of state courts in matters of property rights. Here the guardianship proceeding before the Court of Ordinary was uncontested. The wards were the guardian's own sons and his only heirs. Their relations were most amicable. There is no evidence of even the slightest dissension between them over the guardianship accounting or any ther money matters. Naturally, the sons would not have been *412 expected to complain of the overgenerosity of their father in making his accounting to them, and there was no other interested party. There was no contest before the Court of Ordinary on any controverted question of fact or law. The court merely gave its approval to the uncontested account which petitioner submitted to it. The petitioner states in his brief: * * * Since Respondent complains that the accounting was too generous to the wards, his criticism of the wards is that they did not fight the proceedings to force the guardian to pay less. How unusual would such an effort have been! Here we would have had one who says: "I will pay what the law says stands charged against me." Come his adversaries, saying: "Shame, shame on you, you know you should not pay us so much. We refuse to take it and we will ask this court to use all of its resources to compel you to pay us a much lesser sum." In this realistic world the Petitioner's wards did not act that way - they would take what the law allowed. * * * While there is no evidence that the proceeding before the Court of Ordinary was collusive in the sense that it was conceived or utilized as a means of reducing petitioner's *413 tax liability by spreading his income among the natural beneficiaries of his financial successes, it was "collusive in the sense that all the parties joined in a submission of the issues and sought a decision which would adversely affect the Government's right to additional income tax [or, more accurately in this instance, to retain the tax already returned and paid by petitioner]." Freuler v. Helvering, supra.The rule that questions of property rights are governed by the decisions of the courts of the state having jurisdiction thereof does not apply in cases where there has been no controversy between the parties and no real adjudication by the courts. See Francis Doll, 2 T.C. 276, and cases therein cited. Also Walter A. Frederich, 2 T.C. 936. The very cornerstone of the accounting which the petitioner submitted to the Court of Ordinary was the unchallenged statement of fact that the original $7,500 of funds which petitioner obtained from the sale of his wife's real estate was all invested in the Pastime Theatre. The earnings from the Pastime Theatre were consistently large, even in *414 some years when petitioner's entire business showed losses. Of the $85,985.67 credited to the sons' account for the years 1928 to 1936, inclusive, $72,617.33 represented their portion (46.5%) of the earnings of the Pastime Theatre. Petitioner reported net losses from his entire business for each of the years 1929 to 1933, inclusive. This treatment of the original $7,500 as an investment in the Pastime Theatre, rather than petitioner's general business, accounted for a large portion of the amount determined to be due the sons. The Court of Ordinary had no reason to question that feature of the account. The evidence before us, however, leads to a different conclusion. Hempstead testified in this proceeding that petitioner's books contained no record of investment of any of the guardianship funds. In fact they contained no record of any guardianship account. They merely showed, after the death of petitioner's wife, an indebtedness due to her estate of $7,500 and in each year thereafter an interest charge on the indebtedness, which petitioner claimed as a deduction in his income tax returns and which the Commissioner allowed. Hempstead's testimony was that he asked petitioner about the *415 $7,500 item when he was making his computation, which was begun in 1939, and that petitioner told him that he could not remember what it represented; that he (Hempstead) accepted it as the staring point because it had been set up as a liability from petitioner to his wife by the technical staff. In an affidavit which petitioner submitted to the Commissioner in August, 1941, he stated that in the early days he often "borrowed" money from his wife and others to expand his business. Petitioner testified in this proceeding: A. And we [petitioner and his wife] put our money together, using her rent moneys and her property from 1918 on through, ever since the loss of her mother in 1918 her money was jointly deposited with mine and went into the same ventures. When asked whether he accumulated the large profits claimed as guardianship funds as a guardian for the boys, or as administrator of his wife's estate, or as an individual, he replied: A. Well, I hardly know how to answer that. In other words, our money was invested jointly and they were all in the theatre business and I accumulated money for them just the same as I did otherwise. Petitioner further testified that he deposited *416 all of the $7,500 which he acquired from the sale of his wife's property in his bank account and used some of it to pay off obligations at the bank which he had incurred in constructing the Pastime Theatre and some to purchase equipment for the theatre. To the extent that the funds were used to pay off petitioner's personal obligations to the bank their identity was lost. Actually the funds that went into the construction of the theatre were the petitioner's own personal funds which the bank had lent him. Likewise, the funds which petitioner received from the J. E. Miller estate amounting to $6,100 were all paid to the bank on a note which petitioner had given the bank in borrowing funds for the construction of the Royal Theatre. We think that all of these funds, that is, those acquired by petitioner directly from his wife and those acquired from her father's estate, must be treated as investments in petitioner's general business and not as investments in any particular properties. Petitioner concedes, as shown in the Hempstead report, that some of the funds which he acquired from his wife's property, such as rents on items of real estate not involved in this proceeding, were invested *417 in his general business; likewise, that all of the earnings on the guardianship funds were reinvested in his general business. We do not think that the evidence shows any basis for distinguishing these funds from the other funds which petitioner received from his wife or her estate. Petitioner's various theatre properties were all handled as a part of the same business enterprise. All of the earnings went into his bank account and were subject to his absolute control. The Pastime Theatre and Royal Theatre were not separate business enterprises but were themselves a part of petitioner's general business. It is stated in petitioner's brief that: * * * there is no question that the petitioner was engaged in trade or business and that all the monies of the wards were used by him in the transaction of his business. All the income of the business he had taken in previous years into his personal accounts and had paid appropriate taxes thereupon. We think that petitioner's income for the taxable years before us, 1937, 1939, and 1940, should be recomputed in accordance with our findings that all of the original guardianship funds and earnings thereon were invested in petitioner's general *418 business, rather than in specific properties, and that the income from such funds should be excluded from petitioner's individual income tax returns. We sustain the petitioner in his second contention that he is not taxable on the earnings from the properties which he transferred to his sons in 1937, 1938, and 1939, in satisfaction of his guardianship liability to them. These transfers were all made with the intention of passing title to the properties to the sons. The transfers of the properties to the sons were approved by the Court of Ordinary at the conclusion of the guardianship proceeding and although the value of the properties may exceed petitioner's guardianship liability, as recomputed in accordance with our determination in this proceeding, the transfers were nevertheless valid as between the parties themselves. The evidence is that notwithstanding the transfer of title to these properties to the sons petitioner continued to operate them just as he operated his own. He received all the income which the properties produced and did not segregate it from the income which he received from property standing in his own name or set it aside for the sons. It does not appear, *419 however, that petitioner received this income from the sons' properties under "a claim of right" (see North American Oil Consolidated v. Burnet, 286 U.S. 417, or that he ever regarded it as his own income. On the other hand the evidence is that both the petitioner and his sons regarded this income as belonging to the sons. The sons reported it in their individual income tax returns for all the years 1937 to 1940, inclusive. If after transferring the properties to his sons petitioner continued to manage them and to receive the income from them for the benefit of the sons, as apparently was the case, then we think that the income must be taxed to the sons and not to the petitioner. Whether to the extent that the transfers exceeded petitioner's liability for guardianship funds they constituted gifts to the sons is a question with which we are not concerned in this proceeding. In adding the earnings from these properties to petitioner's income the respondent in his deficiency notice makes reference to section 45 of the Internal Revenue Code. That section deals with the "Allocation of Income and Deductions" between or among "organizations, trades, or *420 businesses * * * owned or controlled directly or indirectly by the same interests." That section of the statute has no application here. The petitioner's properties and his sons' properties were not separate organizations, trades, or businesses. We see no reason for any allocation either of income or deductions between petitioner and his sons; nor, in fact, does it appear that the Commissioner has attempted to make any such allocation. What he has done is to include all of the earnings from the sons' properties in petitioner's income. Presumably he has accorded the deductions the same treatment. Our question is to determine whether the petitioner or the sons were the true owners of the earnings. Petitioner's third contention is that he should be allowed a deduction in 1939 of $104,337.64 representing the excess of the amount of the transfers to his sons in 1939, which, according to the Hempstead report, amounted to not less than $117,529.17, over the earnings of the guardianship funds for that year, amounting to $13,192.08. It is not shown in the pleadings whether petitioner claims this deduction as a loss or as a business expense, or otherwise. He refers to it in his brief as a "loss *421 of capital" and cites cases dealing with payments made in satisfaction of a judgment for breach of contract, such as Lucas v. American Code Co., 280 U.S. 445. We do not think that petitioner's payments to his sons come under any of the deductions allowed by the statute. If, as he strenuously contends, petitioner did no more than pay over to his sons the moneys and properties that were rightfully theirs he could not have suffered any loss of his own income or capital by reason of such payments. Petitioner's contention that the earnings from the guardianship funds should be eliminated from his income, an issue which we have determined in his favor, subject to recomputation of such income, is inconsistent with his contention that the payment of those earnings to the sons resulted in a loss to him. If neither the original guardianship funds nor the earnings thereon belonged to petitioner then he suffered no loss when he paid them over to their rightful owners. There is no analogy between the surrender of guardianship funds by a guardian and the payment of damages or other liability by a judgment debtor, out of his own funds. There is evidence before us *422 that petitioner actually transferred to his sons in 1939 more than was accounted for in the Hempstead report and in the order of the Court of Ordinary. When asked how much had been paid by petitioner to his sons during 1939 Hempstead replied: A. That I am not prepared to answer. During the year 1939, according to my report, his liability was discharged, and we only applied sufficient payments beginning the 1st of January to July, in the amount of $117,529.72. Q. In other words, you disregarded any payments that had been made by the father or the Petitioner to his wards or by the father to his sons beyond the amount necessary to discharge the liability? A. That is right. The evidence referred to further demonstrates that petitioner was not dealing with his sons at arm's length and strictly in accordance with his guardianship responsibility to them, and raises further doubt as to the propriety of accepting the guardianship settlement as determinative of petitioner's income tax liability to the Federal government. Finally, the respondent contends that any recovery of the taxes paid by petitioner for 1937 is barred by the statute of limitations. He contends that the purported claim *423 for refund which petitioner filed for that year on March 12, 1941, does not comply with the requirements of a valid claim as set forth in article 322-3 of Regulations 94 in that it does not "set forth in detail and under oath each ground upon which a refund is claimed, and facts sufficient to apprise the Commissioner of the exact basis thereof. * * * A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund." In support of this contention the respondent relies upon United States v. Felt & Tarrant Mfg. Co., 283 U.S. 269, in which the Supreme Court said: The filing of a claim or demand as a prerequisite to a suit, to recover taxes paid is a familiar provision of the revenue laws, compliance with which may be insisted upon by the defendant, whether the collector or the United States. Tucker v. Alexander, 275 U.S. 228, 48 S. Ct. 45, 72 L. Ed. 253; Maryland Casualty Co. v. United States, 251 U.S. 342, 353, 354, 40 S. Ct. 155, 64 L. Ed. 297; Kings County Savings Institution v. Blair, 116 U.S. 200, 6 S. Ct. 353, 29 L. Ed. 657; *424 Nichols v. United States, 7 Wall. 122, 130, 19 L. Ed. 125. One object of such requirements is to advise the appropriate officials of the demands or claims intended to be asserted, so as to insure an orderly administration of the revenue, Nichols v. United States, supra, page 130 of 7 Wall., a purpose not accomplished with respect to the present demand by the bare declaration in respondent's claim that it was filed "to protect all possible legal rights of the taxpayer." The claim for refund which section 1318 makes prerequisite to suit, obviously relates to the claim which may be asserted by the suit. Hence, quite apart from the provisions of the Regulation, the statute is not satisfied by the filing of a paper which gives no notice of the amount or nature of the claim for which the suit is brought, and refers to no facts upon which it may be founded. We think that the respondent's contention that the purported claim of March 12, 1941, was not a valid claim for refund must be sustained upon authority of United States v. Felt & Tarrant Mfg. Co., supra. See *425 also United States v. Andrews, 302 U.S. 517; United States v. Garbutt Oil Co., 302 U.S. 528; Tucker v. Alexander, 15 Fed. (2d) 356; Phoenix Glass Co. v. United States, 34 Fed. (2d) 217. It follows that the purported amended claim later filed is of no validity, being filed after the expiration of the statutory period, and that the recovery of any overpayment of taxes for 1937 is barred by the statute of limitations. Decision will be entered under Rule 50.